UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

JERRY LOUSTEAU                                                                    PLAINTIFF

v.                                                              CIVIL ACTION NO. 3:11cv676-DPJ-FKB

CITY OF CANTON, MISSISSIPPI, et al.                                     DEFENDANTS

ORDER

This § 1983 case is before the Court on Defendants' Motion for Summary Judgment

[138].  According to Plaintiff Jerry Lousteau, the defendants violated his First Amendment right

to free speech and his Fourth Amendment right to be free from unlawful seizure.  But because

the Court concludes that Plaintiff fails to raise factual issues for trial, the motion is granted.

I.        Facts and Procedural History

Lousteau has owned and operated the WMGO radio station in Canton, Mississippi, since

the mid-1990s.  As part of the station's programming, Lousteau broadcasts a "news commentary"

Monday through Friday in the 7:00 a.m. hour that repeats at 8:00 a.m., 9:00 a.m., and noon.

Lousteau frequently discusses events in Canton, and he regularly attends and reports on meetings

of the Mayor and Board of Aldermen.  Lousteau is often critical of and insulting to now-former

Mayor William Truly, his wife, and Police Chief Vickie McNeil.  Lousteau asserts that the City

of Canton, Truly, and McNeil "engaged in an ongoing campaign of retaliation" against him for

the exercise of his First Amendment rights through his broadcasts.  Pl.'s Resp. [143] at 1.

Lousteau's public comments have caused controversy for more than a decade.  As early

as 1998, when Truly was a Canton Alderman, Truly accused Lousteau of airing racially-divisive

content on WMGO, asserting that an attack on Truly was an attack on "the entire African-

American community."  Second Am. Compl. [35] ¶ 25; *see* May 21, 1998 Madison County

Journal Article [142-11].

These controversies heated up during the 2009 Canton municipal election, when Lousteau

ran against Truly for mayor.  On May 5, 2009, the day of the election, Lousteau became aware

that "there were nine adult absentee ballots cast from" a single home in Canton.  Lousteau Dep.

[142-13] at 198.  The voters "had three different last names," which aroused Lousteau's

suspicion that the voters might be engaged in voter fraud.  *Id.*  Lousteau drove by the address and

observed an elderly woman in the driveway who turned out to be Ammie Gilkey, Alderman Eric

Gilkey's mother.  When asked by Lousteau, Ms. Gilkey initially denied that the voters lived at

that address, but she then told Lousteau it was "[n]one of [his] business," and Lousteau left.

*Id.* at 201.

Following Lousteau's encounter with Ms. Gilkey, Alderman Gilkey called then-police

chief Robert Winn to complain about Lousteau's conduct.  Alderman Gilkey told Winn that he

wanted to press charges against Lousteau, and Winn advised him that Ms. Gilkey would have to

come to the police station herself "to file the charges."  Winn Dep. [138-18] at 7.  Winn

suggested that Ms. Gilkey should "wait until after that particular day of the election to address

the situation."  *Id.*  Alderman Gilkey also approached Lousteau at a polling station later that day

and said "[t]hat he was going to have [Lousteau] put in jail and [Lousteau] better leave his family

alone, and [Lousteau] ain't got no business, you know, sticking [his] nose in [the] election."

Lousteau Dep. 196.

Ultimately, on July 18, 2009, Ms. Gilkey filed a criminal affidavit against Lousteau.

Alderman Gilkey and one of Ms. Gilkey's daughters accompanied her to the police station to file

the charges.  On July 20, 2009, the Canton Municipal Court issued a warrant for Lousteau's arrest on a disturbing-the-peace charge.  Lousteau self-reported to the police station, was booked, and was released on his own recognizance.  Sometime thereafter, Gail Brown, a Deputy Municipal Court Clerk, told Lousteau "we've got you in our court now."  Lousteau Dep. 210–11. The charges against Lousteau were ultimately dismissed because Ms. Gilkey failed to appear at Lousteau's trial.

On February 19, 2011, McNeil, Brown, and others handed out fliers encouraging people to stop listening to Lousteau's radio station.  McNeil was off duty at the time she passed out the fliers, which were prepared by someone else.  The fliers accused Lousteau of "threaten[ing] the very progress that Canton has made by attempting to divide the city racially and economically." Flier [142-7].  The fliers further stated that Lousteau's "ongoing hate speech derails new businesses from wanting to locate in Canton, potentially costing us jobs and commerce," "devastates existing businesses, costing us a healthy tax base," and "hurts our schools, lowering the self-esteem of children subjected to his message of hatred and intolerance."  *Id.*

By fall 2011, Lousteau began having run-ins with Truly at Board of Aldermen meetings. For instance, at an October 2011 meeting, Truly "accused [Lousteau] of being the son of the devil and announced that [Truly] was the son of God."  Lousteau Dep. 134.  At a November 2011 meeting, Lousteau says Truly "suddenly called upon [him] to give an opening prayer."  *Id.* at 256.  At a subsequent meeting later that month, Truly announced that a city employee was videotaping the proceedings so that "if 'anyone lies about the city' . . . or 'is not reporting the positive news about the city,' then the video would be placed on the city's [w]ebsite so that everyone can see the truth."  *Id.* at 254.  Following a December 6, 2011 Board of Aldermen

3

meeting, Truly invited members of the public to a meeting in his office concerning garbage fees. Lousteau attempted to attend the meeting but Truly excluded him.

At a February 2012 Board of Aldermen meeting, Lousteau tried to ask the city attorney a question, and Alderman Smith indicated that he wanted to hear what Lousteau had to say.  Truly stated that he would not allow Lousteau to speak, and Smith got up from his chair and approached Lousteau.  Truly told Smith, "if you want to talk to [Lousteau,] you're going to take him outdoors."  *See* Notice of Conventional Filing [147], Ex. II.  Smith continued to walk toward Lousteau, and Truly instructed a police officer who was present to "remove these—because I'm not going to have you guys disrespecting the Mayor or disrespecting the Board."  *Id.*  Smith returned to his seat and Truly continued to threaten to remove Smith.

Lousteau also alleges that he was frequently escorted from the room at the conclusion of Aldermen meetings while others were able to leave at their own pace.  Lousteau alleges that, at some point, Truly instructed city employee Lisa Lucas not to talk to Lousteau because he was evil.  And Lousteau alleges that Gail Brown frequently verbally assaulted him.

On at least one occasion, Truly announced at an Alderman meeting "that if anyone wanted to file an FCC complaint [against] Mr. Lousteau [Truly] would help them."  Truly Dep. [142-3] at 81.  In April 2012, Truly himself submitted to the FCC a petition to deny Lousteau's application for license renewal.  Truly's city-paid secretary prepared the petition, and Truly gave blank signature pages to two individuals to gather signatures.  Truly admits that he put together the petition so that Lousteau "would change his broadcasting format," "would stop broadcasting information as not in the best interest of the community," and "will stop simply attacking African-American political leaders."  Truly Dep. 92.  McNeil told a local pastor about the

4

petition, indicating that she was "getting a petition together to quiet [Lousteau] down."  Hunter

Dep. [142-2] at 31.  That pastor encouraged his parishioners to sign the petition.  The FCC

denied Truly's petition and renewed Lousteau's license on September 18, 2012.

Finally, in an interview with the Clarion-Ledger in July 2012, Truly stated, "We're

monitoring Mr. Lousteau.  His news is not in the best interest of the community."  Article [142-

6].  Truly testified that he meant he was "listening to [Lousteau's] broadcasts."  Truly Dep. 96.

Lousteau filed this lawsuit against the City of Canton, Truly, and several John Doe

Defendants on November 2, 2011.  McNeil was added as a defendant in the Second Amended

Complaint filed June 12, 2012.  Lousteau asserted claims under 42 U.S.C. § 1983 for violation of

his First and Fourth Amendment rights as well as a claim under 42 U.S.C. § 1981 that has now

been dropped.  Defendants filed their motion for summary judgment on June 12, 2013.  The

motion has been fully and well briefed by both sides.  The Court has personal and subject-matter

jurisdiction and is prepared to rule.

II.     Standard

Summary judgment is warranted under Rule 56(a) of the Federal Rules of Civil Procedure

when evidence reveals no genuine dispute regarding any material fact and that the moving party

is entitled to judgment as a matter of law.  The rule "mandates the entry of summary judgment,

after adequate time for discovery and upon motion, against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the

district court of the basis for its motion, and identifying those portions of [the record] which it

5

believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. The

nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing

that there is a genuine issue for trial.'" *Id.* at 324 (citation omitted). Conclusory allegations,

speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute

for specific facts showing a genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.*,

276 F.3d 754, 759 (5th Cir. 2002); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)

(en banc); *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993). In reviewing the evidence, factual

controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have

submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075. When such contradictory

facts exist, the court may "not make credibility determinations or weigh the evidence." *Reeves v.*

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted).

III.    Analysis

        Defendants assert that summary judgment is appropriate "because Lousteau cannot

demonstrate a violation of the Constitution . . . ." Defs.' Mem. [139] at 10. Alternatively, they

argue that even if Lousteau has established constitutional violations, his claims against the City

of Canton fail for lack of an actionable municipal policy or custom, and his claims against the

individual defendants are barred by qualified immunity. Because the Court concludes that

Lousteau has not shown that his constitutional rights were violated, it need not address the

municipal-liability and qualified-immunity issues.[1]

---

[1]An essential element for municipal liability under § 1983 is "a violation of constitutional rights whose 'moving force' is [a municipal] policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citation omitted). And to overcome Truly and McNeil's qualified immunity defense, the Court must first determine "whether plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002) (citation

A.      Fourth Amendment Claim

Lousteau asserts that he suffered a violation of his Fourth Amendment right to be free from false arrest.  "To prevail on his Fourth Amendment false arrest claim, [Lousteau] must sufficiently allege (1) that he was arrested, and (2) the arrest did not have the requisite probable cause."  *Rhodes v. Prince*, 360 F. App'x 555, 558 (5th Cir. 2010) (citing *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 655–56 (5th Cir. 2004)).  And as to the particular defendants against whom relief is sought, Lousteau must prove that they had some "involvement in the decision to arrest and/or detain" him.  *Granger v. Slade*, 361 F. Supp. 2d 588, 596 (S.D. Miss. 2005) (Lee, J.).

As Defendants correctly point out, there is no record evidence suggesting that Truly or McNeil had any involvement in the procurement or issuance of the warrant for Lousteau's arrest, which was issued after Ms. Gilkey signed an affidavit against Lousteau.  Lousteau acknowledges as much, arguing that "[t]here is *substantial reason to believe* . . . that the Canton Defendants encouraged [Ms. Gilkey] to [sign the affidavit] and participated in the process."  Pl.'s Mem. [143] at 28 (emphasis added).  But "speculation . . . do[es] not adequately substitute for specific facts showing a genuine issue for trial."  *TIG Ins. Co.*, 276 F.3d 754, 759 (5th Cir. 2002) (citing *Recile*, 10 F.3d at 1097)).  The Fourth Amendment claim fails as to these Defendants on that basis alone.

Even if Lousteau had produced evidence linking the individual defendants to his arrest, Lousteau's claim fails because he cannot prove the absence of probable cause.  "Where an arrest is made under authority of a properly issued warrant, the arrest is simply not a false arrest."  *Smith v. Gonzales*, 670 F.2d 522, 526 (5th Cir. 1982) (citation omitted) (cited in *Maas v. Moran*,

_____

omitted).

7

No. 1:11CV287-LG-RHW, 2013 WL 4456154, at *5 (S.D. Miss. Aug. 16, 2013)).  Here, it is

undisputed that a municipal court judge reviewed Ms. Gilkey's affidavit and issued an arrest

warrant.  Because Lousteau has no evidence to suggest that the arrest warrant was invalid, he has

not shown that the arrest pursuant to the warrant violated his Fourth Amendment rights.[2]

Defendants are entitled to summary judgment on this claim.

      B.     First Amendment Claim

     Lousteau asserts that Defendants engaged in a campaign of retaliatory conduct against

him for exercising his First Amendment rights.  To succeed on his First Amendment claim,

Lousteau "must show that (1) [he was] engaged in constitutionally protected activity, (2)

[Defendants] caused [him] to suffer an injury that would chill a person of ordinary firmness from

continuing to engage in that activity, and (3) [Defendants'] adverse actions were substantially

motivated [by Lousteau's] exercise of constitutionally protected conduct." *Keenan v. Tejeda*,

290 F.3d 252, 258 (5th Cir. 2002).

     As to the second element, the Fifth Circuit stated in *Keenan* that "a retaliation claim

requires some showing that the plaintiff['s] exercise of free speech has been curtailed." *Id.* at

258 (citations omitted).  Lousteau questions the accuracy of that holding, noting that in *Linzy v.*

*Cedar Hill Independent School District* the Fifth Circuit concluded that the existence of a

---

    [2]Lousteau asserts that "[w]hen a criminal case is dismissed due to the actions of the
complaining party, it supports an inference that the complaining party had no probable cause for
his action."  Pl.'s Mem. [143] at 27 n.17 (citing *Gunter v. Reeves*, 21 So. 2d 468, 471 (Miss.
1945)).  But in the case Lousteau relies upon, the criminal charges were dismissed "at the
instance of" the complaining witness.  *Gunter*, 21 So. 2d at 471.  By contrast, the charges in the
case against Lousteau were dropped because Ms. Gilkey did not show up for the trial, and Ms.
Gilkey testified without contradiction that she was not present because she was never notified of
the trial date.  Gilkey Dep. [142-17] at 26.  *Gunter* is distinguishable.

curtailment requirement remained an open question.  No. 01-11145, 2002 WL 1021883, at *1 n.7 (5th Cir. May 9, 2002).  But *Linzy* was handed down after *Keenan*, fails to mention *Keenan*, and is in any event unpublished and therefore not binding.  *Keenan* controls, and as discussed below, the undisputed evidence demonstrates that Defendants' actions did not curtail Lousteau's speech.

For starters, the record evidence includes transcripts from several of Lousteau's post-litigation broadcasts in which he engaged in speech similar to the protected speech at the heart of his retaliation claim.  For example, after he filed this lawsuit, Lousteau continued to refer to Truly as "Mayor Falsely," he questioned whether Truly's wife was named "after her grandmother's favorite mule from the old days," he accused "Mayor Truly and his gang of thugs" of "stuffing the ballot box" for Truly's wife, he suggested that Truly's wife had the "mentally challenged vote locked up," and he accused McNeil of lying about the number of reserve officers employed by the Canton Police Department.  Defs.' Mem. [139] at 3–4, 15 & nn. 92–95.

Even more telling is Lousteau's own testimony on the matter.  While he indicates that he might think twice about speaking out, he ultimately has not let Defendants' actions deter him:

> Q      Okay.  You were asked a—a number of questions by Mr. Friedman about—that you're—you still—you're still giving your opinion today, you're still doing it today.  Do you remember those questions, generally?
>
> A      Yes.
>
> Q      Did you mean to convey that—that none of these actions by these defendants have in any way caused you to hesitate, be reluctant, that it's not bothered you at all?
>
> A      It bothered me a lot.  It had—yeah, I hesitate a lot.
>
> Q      Okay.  Have you been more careful in what you're saying because of what they've done?

A      Look I—I—I—to do my job effectively, I have to try and not overanalyze it.  But, yeah.  I mean, when you're having nightmares about—about this stuff and you lose sleep and then you wake up and you're having a nightmare about it, and then you have to go to work at 7:00 o'clock that morning and talk about it.  It weighs pretty heavy on your mind.  But if I stop doing my job, then Mayor Truly's wish comes true, and he said when he called me the son of the devil, that he will win and I will lose, that's a quote from him.  And I don't look at it as that type of battle, but since it's been painted that way as good versus evil and I'm going to lose and he's going to win, I mean, *I can't just stop doing my job*.  One, I need it to make a living; and, two, I think I would be doing the citizens of Canton a disservice because obviously a lot of them listen to my radio station and there must be a reason for that.  So, I—yeah, I—I have second thoughts and look over my shoulder all the time, but I—I—other than the occasional day off or the occasional just, you know, throw in the towel temporarily and then plunge ahead, I—I—*I certainly can't tell you that it's—it's going to keep me from doing my job.* I—I just—I'm not that kind of person.

Lousteau Dep. 306–07 (emphasis added).

That Lousteau may have become more careful before he proceeds is not enough to show that his speech was actually curtailed when he ultimately states that Defendants' actions would not keep him from speaking.  *Colson v. Grohman*, 174 F.3d 498, 514 (5th Cir. 1999) (affirming summary judgment on First Amendment claim brought by former city council member, noting that "the attacks on [the plaintiff] seem to have had no effect other than to make her 'become more careful on which items [she] would vote on,' and they did not stop her from running for reelection," and concluding that the plaintiff had "not alleged any First Amendment deprivation actionable under § 1983").  So in light of his continued comments and his own testimony regarding his subjective intent to continue speaking, no reasonable juror could find that Defendants' actions had an actual chilling effect on Lousteau's speech.  His First Amendment claim therefore fails.[3]

---

[3]Certain aspects of Lousteau's case suggest that Defendants attempted to infringe upon his right to free speech and control the content of local news while acting under color of state

IV.     Conclusion

The Court has considered all the parties' arguments.  Those not addressed would not have changed the outcome.  For the foregoing reasons, Defendants' Motion for Summary Judgment [138] is granted.  A separate judgment will be entered in accordance with Federal Rule of Civil Procedure 58.

**SO ORDERED AND ADJUDGED** this the 23rd day of October, 2013.

s/ *Daniel P. Jordan III*
UNITED STATES DISTRICT JUDGE

---

law.  But because Lousteau continued to speak, the claim must fail.